FILED
United States Court of Appeals
Tenth Circuit

December 16, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MICHELLE DAWN MURPHY,

     Plaintiff - Appellant,

v.

THE CITY OF TULSA,

     Defendant - Appellee.

No. 18-5097

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 15-CV-528-GFK-FHM)**
_____

John J. Carwile (Tara D. Zickefoose with him on the briefs), Baum Glass
Jayne & Carwile PLLC, Tulsa, Oklahoma, on behalf of the Plaintiff-
Appellant.

T. Michelle McGrew (Kristina L. Gray with her on the briefs), Tulsa,
Oklahoma, on behalf of the Defendant-Appellee.

_____

Before **BACHARACH, McHUGH,** and **EID**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

This appeal grew out of the Tulsa Police Department's investigation

into the murder of an infant. The police suspected the infant's mother, Ms.

Michelle Murphy. Ms. Murphy ultimately confessed, but she later recanted and sued the City of Tulsa under 42 U.S.C. § 1983. The district court granted summary judgment to the City, concluding that Ms. Murphy had not presented evidence that would trigger municipal liability. We affirm.

I.   **Ms. Murphy is convicted of murder after confessing in an allegedly coercive interrogation.**

Roughly 25 years ago, Ms. Murphy had two small children: an infant son and a little girl. The infant son was killed, and the police suspected Ms. Murphy. She ultimately confessed after allegedly being threatened that she'd never be able to see her little girl again.

Ms. Murphy's confession led to her conviction for murder. After she had served roughly 20 years in prison, her conviction was vacated and the case was dismissed with prejudice.

II.   **Ms. Murphy sues the City, which obtains summary judgment based on a failure to prove a basis for municipal liability.**

Ms. Murphy sued the City of Tulsa under 42 U.S.C. § 1983, claiming that

- a police officer had violated the Constitution by coercing her confession and

- the City of Tulsa had incurred liability for that constitutional violation.

The district court concluded that the City could not incur liability because the constitutional violation had not resulted from an unlawful policy or

custom.[1] Given this conclusion, the district court granted summary judgment to the City.

## III. Our review is de novo.

We engage in de novo review, "drawing all reasonable inferences and resolving all factual disputes in favor of [Ms. Murphy]." *Yousuf v. Cohlmia*, 741 F.3d 31, 37 (10th Cir. 2014). With these favorable inferences, we consider whether the City of Tulsa has shown the lack of a genuine dispute of material fact and the City's entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## IV. No municipal policy or custom authorized police officers to threaten citizens during interrogations.

Municipalities can incur liability for their employees' constitutional torts only if those torts resulted from a municipal policy or custom. *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993). Five potential sources exist for a municipal policy or custom:

1. a "formal regulation or policy statement,"

2. an informal custom amounting to a "widespread practice that, although not authorized by a written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law,"

3. the decision of a municipal employee with final policymaking authority,

---

[1] The district court also concluded that a genuine issue of material fact existed on the constitutionality of the interrogation. We need not address that conclusion.

3

4. a policymaker's ratification of a subordinate employee's action, and

5. a failure to train or supervise employees.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted).

Ms. Murphy relies on each potential source of municipal liability. In our view, however, Ms. Murphy failed to present evidence supporting municipal liability under any of the five sources.[2]

## A. No formal regulation or policy statement authorized police officers to make threats.

Official policies can exist through municipalities' "formal rules or understandings." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986). These formal rules or understandings are "often but not always committed to writing" and "establish fixed plans of action to be followed under similar circumstances consistently and over time." *Id.*

Ms. Murphy argues that a formal rule authorized officers to use threats, pointing to

- a former police chief's testimony that police officers could decide for themselves what kinds of threats to use during interrogations and

---

[2] Because Ms. Murphy has not established a municipal policy or custom, we need not decide whether a "direct causal link [exists] between the policy or custom and the injury alleged." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).

4

- the City's alleged abandonment of a prohibition against threats in interrogations.

But Ms. Murphy failed to properly support these arguments in district court.

### 1. Ms. Murphy did not properly present the district court with the former police chief's testimony about the permissibility of threats.

An official policy exists only if it came from a final policymaker. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010). The parties agree that the only final policymaker here is the former police chief, and Ms. Murphy relies on his testimony. But Ms. Murphy didn't properly present the district court with the pertinent part of this testimony. Ms. Murphy's error wasn't merely technical. The district court might have discovered the pertinent part of the testimony only by trudging without guidance through 1540 pages of exhibits.

Ms. Murphy relies here on this excerpt from the former police chief's testimony:

Q. [The sergeant] further testified that the interrogator had the full authority of the Tulsa Police Department to decide what touching of the suspect would occur. Do you agree with that testimony?

A. I believe there were guidelines about no sexual touching. I mean, that would be a violation of law. But touching a suspect is not specifically prohibited.

Q. [The sergeant] further testified that an interrogator had the full authority of the Tulsa Police Department to decide

5

> what kind of threats to make. Do you agree with that
> testimony?
>
> A. They would have.

Appellant's App'x, vol. 10, at 2680, 2729. But this excerpt was not properly presented to the district court.[3]

Though our review of a summary-judgment grant is de novo, "we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008)). If materials were not properly presented to the district court, "we will not reverse [the] district court for failing to uncover them itself." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). The district court would otherwise need to scour the summary-judgment record to discern whether it supported the party's arguments. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1246 n.13 (10th Cir. 2003) (explaining that the district court

---

[3] The City has not urged affirmance based on Ms. Murphy's failure to properly present the district court with the pertinent part of the former police chief's testimony. But even without an argument by the City, we can affirm on any ground supported by the record. *Ross v. Neff*, 905 F.2d 1349, 1353 n.5 (10th Cir. 1990). Exercising this authority is appropriate here because Ms. Murphy is relying on evidence that the district court never had a realistic opportunity to consider.

need not comb through the summary-judgment record for evidence supporting the movant's arguments).

In her amended response to the summary-judgment motion, Ms. Murphy referred twice to the former police chief's testimony.[4] The first reference came in this sentence: "[The former police chief] had two policies which authorized Constitutional violations." For this sentence, Ms. Murphy cited pages 31–32 of her brief. Appellant's App'x, vol. 9, at 2475. These pages did not refer to the two policies. The second reference came two pages later, where Ms. Murphy stated that the City had given "'full authority' to its interrogators to conduct interrogations however they wanted to, including threats." Appellant's App'x, vol. 9, at 2505.[5] For these statements, however, Ms. Murphy did not cite any evidence.

In her original response to the City's motion for summary judgment, Ms. Murphy had referred to Fact 113 from her statement of facts:

---

[4]     At oral argument, Ms. Murphy also argued for the first time that the district court was aware of the challenged part of the testimony, stating that she had brought the testimony to the court's attention during the hearing on the motion for summary judgment. But "arguments made for the first time at oral argument are waived." *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1294 (10th Cir. 2017).

[5]     In Ms. Murphy's original response to the City's motion for summary judgment, this statement did appear on pages 31–32. *See* Appellant's App'x, vol. 5, at 1257–58. In the amended version of Ms. Murphy's response brief, Ms. Murphy again indicated that the statement would appear on pages 31–32; but this statement had been moved to page 34.

7

The Final Policymaker, and the Supervisor of the Homicide Squad, Sgt. Allen, testified that when an interrogator went alone into the interrogation room, without a video or tape recorder going, that interrogator had the "full authority" of [the Tulsa Police Department] to make his own decisions on how to conduct the interrogation, including what kind of threats to make (49, 50).

Appellant's App'x, vol. 5, at 1238 (emphasis omitted).[6] In Fact 113, Ms. Murphy had referred to an exhibit (Exhibit 49) containing this excerpt from the former police chief's testimony:

Q.    [The sergeant] further testified that the interrogator had the full authority of the Tulsa Police Department to decide what touching of the suspect would occur. Do you agree with that testimony?

A.    I believe there were guidelines about no sexual touching. I mean, that would be a violation of law. But touching a suspect is not specifically prohibited.

---

[6]    In her amended response, Fact 113 included the same text and again cited Exhibits 49 and 50. But in the amended response, Fact 113 also included citations of testimony appearing in Exhibits 49 and 50:

The Final Policymaker, and the Supervisor of the Homicide Squad, Sgt. Allen, testified that when an interrogator went alone into the interrogation room, without a video or tape recorder going, that interrogator had the "full authority" of [the Tulsa Police Department] to make his own decisions on how to conduct the interrogation, including what kind of threats to make (*Plt. Exh. 49, Deposition of Ronald Palmer, p. 27, 1. 12-p. 28, 1. 25; Plt. Exh. 50, Deposition of Sgt. Allen, p. 15, l. 19-p.16, 1. 10*).

Appellant's App'x, vol. 9, at 2485. But Exhibit 49 would have been nearly impossible to locate, and the testimony in Exhibit 49 was incomplete. *See* p. 10, below. So these additional citations in Fact 113 would not have alerted the district court to the pertinent part of the former police chief's testimony.

> Q. [The sergeant] further testified that an interrogator had the full authority of the Tulsa Police

Appellant's App'x, vol. 5, at 1330.

The same testimony appeared in Exhibit 49 of Ms. Murphy's amended response to the summary-judgment motion. Appellant's App'x, vol. 10, at 2680. Although Ms. Murphy kept Exhibit 49 in her amended response to the summary-judgment motion, she dropped the reference to Fact 113. Without any reference to Fact 113, the district court no longer had anything in the amended response that even mentioned Exhibit 49. So the district court had no reason to consult Exhibit 49.

But even if the district court had consulted Exhibit 49 (despite the absence of any reference to it), the court still wouldn't have found the pertinent part of the police chief's testimony. Exhibit 49 did not complete the second question and omitted the answer.[7] The cited page stated only that the sergeant "[had] further testified that an interrogator had the full authority of the Tulsa Police . . . ." Appellant's App'x, vol. 10, at 2680. This page did not include anything in the question about threats, so the district court needn't have suspected that the exhibit was missing a page.

---

[7] Fact 113 also referred to Exhibit 50, which appeared in both the original and amended response and contained the sergeant's original testimony. Appellant's App'x, vol. 5, at 1335; vol. 10, at 2684. But the sergeant was not a final policymaker, so his testimony could not show an official policy.

9

The court could instead have simply concluded that Ms. Murphy's assertion was not supported by the summary-judgment record.

Even if the district court had correctly guessed that the pertinent part of the testimony might be on the next page, the entire deposition transcript had never been filed.[8] The district court thus could not have simply opened the deposition transcript and flipped to the next page.

Ms. Murphy points out that the missing page of the former police chief's testimony appears elsewhere in the summary-judgment exhibits. But that page would not have easily been found among the 1540 pages of exhibits. The start of the second question appears in Exhibit 49, and the remainder of the question and the answer appear in Exhibit 63. But Ms. Murphy's brief in district court did not even cite Exhibit 63. So the district court could not be expected to find the missing page in Exhibit 63. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008) (observing that "[a]lthough the document . . . was in the summary judgment record, the lone reference to it [was] . . . in the facts section," not in the arguments section, so the district court could not be expected to find it).

In a later motion to alter or amend the judgment, Ms. Murphy remarked that the district court had correctly stated that the exhibits

---

[8] The Northern District of Oklahoma's rules prohibit the filing of entire depositions unless they are (1) attached to a motion or response or (2) needed for use in a trial or hearing. N.D. Okla. Civ. R. 26.3.

referred only to the sergeant's authorization of threats, not to the former police chief's. Appellant's App'x, vol. 15, at 4249. Ms. Murphy admitted that her amended response brief had failed to include the former police chief's answer because of an "inadvertent omission in the citation to Exhibit 49." Appellant's App'x, vol. 15, at 4249. As we now know, the 1540 pages of exhibits did include the pertinent part of the former policy chief's testimony. But the citation was so difficult to find that even Ms. Murphy's own attorney had not realized that the pertinent page was in the record.[9]

Testimony about a policy allowing threats did appear in two of Ms. Murphy's exhibits (60 and 61). But this testimony does not affect the outcome for two reasons.

First, Ms. Murphy does not urge reliance on Exhibits 60 or 61.

Second, the testimony in Exhibits 60 and 61 came from the police sergeant, not the former police chief. The sergeant's testimony would not have alerted the district court to the former police chief's acknowledgment of the policy.

---

[9] The City's exhibits included the page with the former police chief's answer to the question that had appeared in Ms. Murphy's exhibit. But the City's page with the answer omitted the question, and the text of the City's brief did not point to the testimony or its significance. So the presence of the answer in the City's exhibits would not have alerted the district court to the pertinent part of the former police chief's testimony.

In district court, Ms. Murphy referred to the former police chief's testimony that the police could make threats; but these references were unsupported by the cited parts of the record. The testimony did appear in the exhibits, but Ms. Murphy did not tell the court where to look. The court could have found the rest of the relevant question and answer only by wading directionless through 1540 pages of exhibits. We thus conclude that Ms. Murphy failed to properly alert the district court to the former police chief's testimony on the use of threats.[10]

### 2. The City's written policies did not imply that the police could threaten civilians.

Ms. Murphy also alleges three other facts to show a formal rule allowing the use of threats against individuals like Ms. Murphy:

1. A policy prohibited threats against police officers being questioned in administrative proceedings.[11]

---

[10] The district court also relied on the City's requirement that police officers "defend, enforce, and obey" the Constitution and state and local laws. Appellant's App'x, vol. 16, at 4416. Because Ms. Murphy didn't present the district court with evidence of an unconstitutional formal policy, we need not address the relevance of this requirement.

[11] The policy states:

POLICE OFFICER BILL OF RIGHTS

A. The Chief of Police shall establish and put into operation a system for the receipt, investigation, and determination of complaints against Police Officers received by such Chief of Police from any person.

12

2. No such policy existed for criminal investigations of non-police officers. (We refer to "non-police officers" as "civilians.").

3. A 1934 policy prohibited threats in criminal interrogations, and the City later rescinded this policy.

Ms. Murphy contends that a reasonable fact-finder could infer that the City prohibited threats only when the person being interrogated was a police officer. We reject this contention because Ms. Murphy's evidence does not suggest that the City had a formal rule authorizing threats against civilians.

A city's "liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final

---

B. Whenever an Officer is under investigation and is subject to interrogation . . . such interrogation shall be conducted under the following conditions:

1) Interrogation: . . . .

. . . .

f) The Officer under interrogation shall not be subjected to offensive language or threatened with transfer, dismissal, or disciplinary action. No promise or reward shall be made as an inducement to obtain testimony or evidence.

Appellant's App'x, vol. 10, at 2735–36 (¶ 30(B)(1)(f)).

13

policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). So "[w]hen a § 1983 claim is based on a policy of inaction, the plaintiff must present evidence that the [municipality] made a conscious decision not to act." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019). The fact-finder can sometimes infer a municipality's conscious decision not to act when inaction would render a constitutional violation "highly predictable" or "plainly obvious." *Waller v. City & County of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998)).

Ms. Murphy argues that the City of Tulsa consciously chose inaction, pointing to (1) the greater protections afforded to police officers when they are questioned during administrative proceedings and (2) the City's rescission of a policy prohibiting threats against civilians. These arguments are unsupported.

For her first argument, Ms. Murphy points to protections afforded to police officers in administrative proceedings, not interrogations in criminal investigations. In an administrative proceeding against a police officer, an interrogator cannot threaten a police officer with transfer, dismissal, or disciplinary action. But threats are not prohibited against civilians being interrogated in criminal investigations.

14

This contrast does not suggest a deliberate choice of inaction for interrogation of civilians. As Ms. Murphy points out, no official policy bans threats against civilians being questioned about possible crimes. But the same is true for police officers suspected of possible crimes. There is thus nothing to suggest that the City consciously decided to permit threats against civilians.

Ms. Murphy also argues that the City consciously chose inaction when it rescinded a policy prohibiting threats. For this argument, Ms. Murphy alleges the discontinuance of a policy that had existed in 1934. According to Ms. Murphy, this policy had prohibited threats.

Ms. Murphy is mistaken, for the policy had simply defined confessions and discussed their admissibility:

> A confession is the voluntary declaration made by a person who has committed a crime or misdemeanor to another, acknowledging his agency or participation in the same. It is restricted to an acknowledgement of guilt made by a person after the offense has been committed. A confession of guilt by the accused is admissible in evidence against him when, and only when, it was freely and voluntarily made without having been induced by the expectation of any promise to benefit nor by the fear of any threatened injury.

Appellant's App'x, vol. 10, at 2732. This language parroted Oklahoma law in 1934 on the definition and admissibility of confessions. *See Dumas v. State*, 24 P.2d 359, 361 (Okla. Crim. App. 1933) ("A confession to be admissible must be voluntary; and if made under a promise of benefit or threat of harm by one having him in custody or one having authority over

15

him, it is deemed involuntary."); *Lucas v. State*, 221 P. 798, 800 (Okla. Crim. App. 1924) ("[C]onfessions induced by a promise of benefit or a threat of harm made to a defendant by a prosecuting attorney or an officer having him in custody will be deemed involuntary and will be inadmissible as evidence."). Explaining Oklahoma law on the definition and admissibility of confessions does not amount to an official policy banning threats in interrogations.

Because the 1934 policy didn't prohibit threats, rescission of the policy would not suggest a conscious decision to permit threats. Indeed, over 50 years after the enactment of this policy, Tulsa police stated in a training bulletin: "Any coercion, physical or mental, which causes the suspect to waive his rights will invalidate his statement. Threats are strictly forbidden . . . ." Appellant's App'x, vol. 9, at 2436; *see* Part IV(E), below. Given this training bulletin's clarity, no reasonable fact-finder could infer that the City had consciously decided to rescind a policy banning threats.

### B.    The City of Tulsa had no informal custom authorizing threats in criminal interrogations.

Ms. Murphy also argues that the police department had an informal custom of violating the Constitution through coercive interrogations. We reject this argument.

16

Cities may incur liability when they adopt unconstitutional "longstanding practice[s] or custom[s]" that become "standard operating procedure[s]." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485–87 (1986) (White, J., concurring)). A single unconstitutional incident is ordinarily insufficient for municipal liability. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985). But a single incident may suffice when caused by an existing policy that "can be attributed to a municipal policymaker." *Id.*

According to Ms. Murphy, threats and coercion constituted "standard operating procedure" for the Tulsa Police Department. Appellant's Reply Br. at 17. Though Ms. Murphy has not pointed to any evidence of other interrogations involving threats or coercion, she argues that a single incident suffices here because (1) "interrogations were recurring situations" and (2) the former police chief testified that police officers were permitted to make threats. Appellant's Reply Br. at 17.

But the recurrence of interrogations, in itself, does not show the inevitability of threats. And as discussed above, Ms. Murphy failed to properly present the district court with the former police chief's testimony. *See* Part IV(A)(1), above.[12] Without that testimony, the recurrence of

---

[12]    In her reply brief, Ms. Murphy also relies on the sergeant's testimony about the permissibility of threats. In her opening brief, however, Ms. Murphy did not develop an argument involving the sergeant's testimony on

interrogations alone does not suggest a custom involving threats or coercion.

---

this issue. In that brief, Ms. Murphy simply included one oblique reference (with no citation) to the sergeant's testimony:

> [The former police chief's] testimony and the other evidence submitted to the trial court, support existence of both a formal policy or of an informal policy. Where a longstanding practice or custom can be said to constitute "standard operating procedure" of the local government entity, municipal liability may be imposed. There can be no greater evidence that an unconstitutional practice is "standard operating procedure" than where the final policymaker [agreed to be the former police chief] says that his interrogators had his full authority to make threats, *and when his sergeant likewise testifies that his interrogators had [the Tulsa Police Department's] full authority to make threats*. Murphy's single incident of unconstitutional activity, along with accompanying proof that it was caused by an unconstitutional policy which can be attributed to [the former police chief] as the municipal policymaker, satisfies the single incident test recognized in [*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)].

Appellant's Opening Br. at 32 (emphasis added) (citations omitted). The italicized language does not constitute adequate development of an argument basing a custom on the sergeant's testimony. *See Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008) (stating that an argument is waived when it consists of a single sentence in an appeal brief). Ms. Murphy did elaborate (slightly) in her reply brief, but by this time it was too late to inject a new issue of a custom based on the sergeant's testimony. *WildEarth Guardians v. EPA*, 770 F.3d 919, 933 (10th Cir. 2014).

## C.    No formal policymaker authorized police officers to threaten suspects.

Ms. Murphy contends that the former police chief admitted that he had established a policy allowing threats. This contention is also rooted in the former police chief's testimony, which was not properly presented in district court. *See* Part IV(A)(1), above. We thus conclude that no genuine issue of material fact existed on this contention.

## D.    No final policymaker ratified a practice of threatening suspects.

Ms. Murphy also argues that the former police chief's testimony shows ratification of the allegedly unconstitutional interrogation of Ms. Murphy. This argument again hinges on the former police chief's testimony, which Ms. Murphy failed to properly present in district court. *See* Part IV(A)(1), above. We thus reject this argument as unsupported.

## E.    The City of Tulsa is not liable on a failure-to-train theory.

Municipal liability can also be based on a failure to train officers. But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The municipality can incur liability for a failure to train only upon proof of "deliberate indifference," *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998), which is a "stringent standard of fault," *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). To satisfy this stringent standard, Ms. Murphy needed to show that

19

the City had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation" and "consciously or deliberately [chose] to disregard the risk of harm." *Barney*, 143 F.3d at 1307.

No fact-finder could reasonably infer deliberate indifference in training for two reasons:

1. The City lacked notice of the risk of constitutional violations.

2. The City trained officers not to make threats during interrogations.

To prove notice to the City, Ms. Murphy points to the former police chief's testimony that (1) threats were permissible and (2) the interrogating officer would not have been disciplined for using threats in citizen interrogations. We again decline to consider the former police chief's testimony. *See* Part IV(A)(1), above. And even if we were to consider the former police chief's testimony, it does not suggest notice that inaction would lead to constitutional violations.

Ms. Murphy also argues that the City recognized that its toleration of threats in interrogations would cause constitutional violations. For this argument, Ms. Murphy starts with the City's knowledge that threats would violate the Constitution. But Ms. Murphy does not explain how this knowledge would lead to constitutional violations. Indeed, even with the

20

City's knowledge, Ms. Murphy does not identify a single threat to anyone else.[13]

Even without notice to the City, Ms. Murphy could show deliberate indifference by proving that a constitutional violation would be highly predictable or plainly obvious in certain recurring situations. *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998). Ms. Murphy tries to satisfy this requirement by showing that the City of Tulsa

- failed to train its officers to address recurring situations and

- was substantially certain that these recurring situations would lead to constitutional violations.[14]

In evaluating the City of Tulsa's training, we focus on "purported deficiencies on the part of the City." *Carr v. Castle*, 337 F.3d 1221, 1229

---

[13]    In district court, Ms. Murphy argued that the interrogating detective had also coerced the confession of a second person—LaRoye Hunter. But Ms. Murphy does not reassert this argument on appeal.

[14]    A plaintiff can also show municipal liability based on a failure to provide adequate supervision. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). Ms. Murphy thus titles part of her opening appellate brief "Deliberately Indifferent Failure to Train or Supervise." But her opening brief does not discuss the adequacy of the City's supervision. Appellant's Opening Br. at 35. We decline to consider "arguments that are . . . inadequately presented[] in an appellant's opening brief." *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

Ms. Murphy does add this argument in her reply brief, pointing there to her expert witness's report. Appellant's Reply Br. at 15–16. But the reply brief was too late for Ms. Murphy to inject the issue of inadequate supervision. *WildEarth Guardians v. EPA*, 770 F.3d 919, 933 (10th Cir. 2014).

21

(10th Cir. 2003). Given this focus, inadequacies in a particular officer's training would not trigger municipal liability because that "officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989). Nor is it enough to show that an incident "could have been avoided if an officer had had better or more training." *Id.* at 391.

The bulk of Ms. Murphy's evidence focuses on the training of individual officers. For example, Ms. Murphy points to

- the interrogating police officer's lack of memory about training in interrogations or the frequency of confessions among suspects who are innocent,

- the lack of evidence that training in interrogations had been made available to the police officer conducting the interrogation,

- the sergeant's lack of recollection about training,

- the sergeant's failure to ask his subordinates about the methods that they had used to obtain confessions, and

- the failure to discipline the interrogators for threatening civilians during interrogations.

All of this evidence addresses shortcomings in individual officers' training and supervision, not the City's overall training. These pieces of evidence thus do not suggest deliberate indifference on the City's part.

But Ms. Murphy also challenges the overall adequacy of the training, arguing that the police department failed to teach the constitutional limits of interrogations. Failing to teach police officers about certain

22

constitutional limits can demonstrate a municipality's "'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). Given the potential for coercion in interrogations, failing to teach police officers how to lawfully interrogate civilians might trigger municipal liability. But this possibility is belied by the summary-judgment record.

The City of Tulsa contends that it did teach officers the constitutional limits of interrogation, pointing to a 1987 legal bulletin that tells officers

- how to apply *Miranda v. Arizona*, 384 U.S. 436 (1966), and

- how to interrogate suspects.

In the bulletin, the police department instructs officers not to coerce, threaten, or make promises to suspects:

> CAN THE SUSPECT BE THREATENED OR PROMISED LENIENCY? Any coercion, physical or mental, which causes the suspect to waive his rights will invalidate his statement. Threats are strictly forbidden, but often there is little or no difference between a promise or a threat. Generally, promises of leniency should be avoided. Any promise by the officer that results in an incriminating statement from the suspect will be carefully examined by the courts to see if it amounts to coercion.

Appellant's App'x, vol. 9, at 2436. These instructions make clear that "[t]hreats are strictly forbidden." Appellant's App'x, vol. 9, at 2436; *see* Part IV(A)(2), above.

23

Despite this express prohibition against threats, Ms. Murphy argues that this bulletin serves only to tell officers how to give *Miranda* warnings, not how to ensure that a confession is voluntary. These are two distinct constitutional inquiries: *Miranda* requires a warning before a custodial interrogation, and the right to due process extends beyond *Miranda* to ensure that the confession is voluntary. *United States v. Pettigrew*, 468 F.3d 626, 634 (10th Cir. 2006).

We conclude that the training bulletin unambiguously extends beyond *Miranda*. The bulletin does extensively discuss *Miranda*, but it also addresses the right to due process.[15] At the outset, the bulletin explains that

---

[15] In district court, Ms. Murphy used brackets to imply that the sentence involving threats pertained only to threats designed to obtain an arrestee's waiver of rights under *Miranda*:

> The sentence on p. 5 of **City Ex. 3** thereto which begins, "Threats are strictly forbidden...." Is preceded by this sentence: "Any coercion, physical or mental, which causes the suspect to **waive his [Miranda] rights** will invalidate the statement" (emphasis added), thus allowing the jury to infer that this applies only to pre-*Miranda* interrogation.

Appellant's App'x , vol. 16, at 4362 (emphasis in original). But the word "*Miranda*" does not appear in this section of the training bulletin, which states in its entirety:

> **Can the Suspect be Threatened or Promised Leniency?**
>
> Any coercion, physical or mental, which causes the suspect to waive his rights will invalidate his statement. Threats are strictly forbidden, but often there is little or no difference between a promise and a threat. Generally, promises of leniency

24

it is "a concise statement of the issues involved in confessions." Appellant's App'x, vol. 9, at 2432. And three other topics show that the bulletin extends beyond *Miranda*.

First, the bulletin addresses the voluntariness of confessions by suspects who are intoxicated or suffer a mental disability. Appellant's App'x, vol. 9, at 2437.

Second, the bulletin contrasts the admissibility of (1) coerced confessions and (2) confessions obtained in violation of *Miranda*. For this contrast, the bulletin notes that

- confessions obtained in violation of *Miranda* can be used to impeach defendants and

- "[c]oerced confessions cannot be used for any purpose."

---

should be avoided. Any promise by the officer that results in an incriminating statement from the suspect will be carefully examined by the courts to see if it amounts to coercion. A promise not to file the death penalty or a promise not to file on a relative in return for a confession is likely to render the statement inadmissible. However, it is permissible to tell a suspect that if he cooperates the prosecutor will be informed of his cooperation.

It is important to note that whether or not the suspect believed he would receive leniency is not the issue. The focus is not upon the suspect's beliefs but on the actions of the officer.

Finally, regardless of whether the statement is later admissible, the officer should not make decisions concerning leniency without consulting with the prosecutor's office.

Appellant's App'x, vol. 9, at 2436.

25

Appellant's App'x, vol. 9, at 2437.

Third, the bulletin discusses interrogation of suspects who are expected to lie and describes Oklahoma law's requirements for using a juvenile's statements in court, Appellant's App'x, vol. 9, at 2437—two issues that extend beyond *Miranda* to interrogation in general.

Given the breadth of the bulletin's discussion of confessions, its prohibition against threats unambiguously extends beyond *Miranda* to address other constitutional limits on interrogations.

Ms. Murphy also contends that

- the City never showed that it was still using the 1987 bulletin at the time of her questioning (in 1994) and

- the City failed to show that it had ever distributed the 1987 training bulletin to anyone.[16]

Though the City didn't present the 1987 bulletin in district court until the reply brief, Ms. Murphy could have raised these contentions in her surreply brief or at oral argument on the City's motion. But Ms. Murphy failed to present these contentions at either opportunity. Ms. Murphy thus forfeited

---

[16] Ms. Murphy also argues in her reply brief that the former police chief testified that he hadn't known of a policy in 1994 that banned threats. Raising this argument in the reply brief was too late. *WildEarth Guardians v. EPA*, 770 F.3d 919, 933 (10th Cir. 2014).

these arguments involving the 1987 bulletin. *See Evanston Ins. Co. v. Law Office of Michael P. Medved, P.C.*, 890 F.3d 1195, 1199 (10th Cir. 2018).[17]

Beyond the bulletin, the City of Tulsa contends that it trained its officers on constitutional interrogations in four ways:

1. Training was provided to all police officers involved in investigating Ms. Murphy, and this training included instruction on constitutional rights, statutes, ordinances, instruction on *Miranda* warnings, interviews, interrogations, and juvenile law.

2. To maintain the police officers' certification from the Council on Law Enforcement Education and Training, all police officers attended at least 40 hours of in-service training every year. This training included legal procedures.

3. All new police officers for the City's detective unit had to complete another 40 hours of training in interrogations, arrest warrants, search warrants, and affidavits.

---

[17] We ordinarily may consider forfeited arguments under the plain-error standard. *See Law Office of Michael P. Medved, P.C.*, 890 F.3d at 1199. But Ms. Murphy has not urged plain error, and considering the argument (despite the forfeiture) would be problematic:

[T]he district court did not address this argument, so we would potentially be reversing on an alternative ground not raised or ruled on in district court. The rule that an issue not raised to the district court is forfeited "is particularly apt when dealing with an appeal from a grant of summary judgment, because the material facts are not in dispute and the trial judge considers only opposing legal theories." If this court were to consider new arguments on appeal to reverse the district court, we would "undermine[] important judicial values."

*Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1244 n.6 (10th Cir. 2015) (citation omitted).

27

4. Police officers received monthly legal bulletins on new ordinances, statutes, appellate court decisions, and opinions by the United States Supreme Court.

The City of Tulsa has provided no additional evidence on the content of these trainings and bulletins. Given the lack of detail about much of the content, Ms. Murphy asserts that the City's evidence was too general to avoid municipal liability, arguing that "it is the content of the training, catered to specific re-occurring situations an officer in a specific area might face, that controls the analysis." Appellant's Opening Br. at 37 (emphasis omitted).

Although the City's evidence of training lacks detail, it is specific enough to prevent municipal liability. In *Barney v. Pulsipher*, for example, we affirmed summary judgment to a municipality on a claim involving failure to train correctional officers about the sexual assault of inmates. 143 F.3d 1299, 1308 (10th Cir. 1998). The county presented evidence of a state-certified basic officer training program and a single correctional officer course. *Id.* Because the plaintiff failed to present evidence "pertaining to the adequacy of the instruction [the correctional officer] received in these courses," we concluded as a matter of law that the training was constitutionally adequate. *Id.*

That conclusion is equally fitting here. The City presented evidence that it had taught officers how to interrogate suspects and updated those police officers on relevant legal decisions. And at least one part of that

28

training—the 1987 bulletin—told police officers that they could not make threats during interrogations. Considering the entirety of the training, a fact-finder could not reasonably infer that future constitutional violations would be highly predictable or plainly obvious. *Id.* at 1307; *see* Part IV(A)(2), above.[18]

Ms. Murphy also relies on her expert's report to argue that this training fell short of professional standards on interrogations. For this argument, Ms. Murphy points to *Allen v. City of Muskogee*, 119 F.3d 837 (10th Cir. 1997). There we held that municipal liability could reasonably be inferred from a police department's deviation from training provided elsewhere. 119 F.3d at 843. The issue involved the training's substance because the municipality had trained its officers contrary to the national standard. *Id.*

In our case, the City trained its police officers to follow standard interrogation procedures. Even if the extent of the City of Tulsa's training

---

[18]    In her reply brief, Ms. Murphy argues that the district court found a disputed fact involving the availability of training on interrogation tactics in 1994. We reject this argument for two reasons.

First, "factual findings" are inappropriate in summary-judgment proceedings. *Fowler v. United States*, 647 F.3d 1232, 1239 (10th Cir. 2011). We thus apply de novo review, deciding for ourselves whether the evidence created a genuine dispute of material fact. *Id.*; *see* Part III, above.

Second, it is too late to make new arguments in the reply brief. *WildEarth Guardians v. EPA*, 770 F.3d 919, 933 (10th Cir. 2014).

might have been inadequate, "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick v. Thompson*, 563 U.S. 51, 68 (2011).

* * *

Because Ms. Murphy cannot show deliberate indifference, the City cannot incur liability for failing to train police officers.

## V.    Conclusion

Ms. Murphy failed to raise a genuine dispute of material fact on the existence of a municipal policy or custom authorizing unconstitutional interrogations. We thus affirm the award of summary judgment to the City.