IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 23, 2022

**STEVEN JEFFREY PIKE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 112096   Kyle A. Hixson, Judge**

_____

**No. E2021-01055-CCA-R3-PC**

_____

The Petitioner, Steven Jeffrey Pike, appeals the Knox County Criminal Court's denial of his post-conviction petition, wherein he challenged his conviction for first degree premeditated murder.  On appeal, the Petitioner argues that (1) trial counsel provided ineffective assistance in failing to impeach a witness for the State with the witness's prior statement to police; (2) appellate counsel provided ineffective assistance in failing to raise on appeal the trial court's limitation of defense expert's testimony; (3) appellate counsel provided ineffective assistance in failing to raise on appeal that the Petitioner's involuntary statements constituted a due process violation not subject to harmless error analysis; and (4) the multiple errors committed by trial counsel and appellate counsel constituted prejudicial error in the aggregate.[1]  After review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Appellant, Steven Jeffrey Pike.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns the January 15, 2011 killing of the victim, Angelo Gradillas, who was beaten to death at the home of Alma Pike, the Petitioner's grandmother.  State v. Steven Jeffrey Pike, No. 2015-02357-CCA-R3-CD, 2017 WL 363283, at *1 (Tenn. Crim.

_____

[1] We have reordered the issues on appeal for clarity.

App. Jan. 25, 2017), perm. app. denied (Tenn. Apr. 12, 2017). Shortly thereafter, the Petitioner was charged with first degree premediated murder. Id. A thorough summary of the proof presented at the Petitioner's trial can be found in this court's opinion on direct appeal. Id. at *1-14.

At trial, the Petitioner was convicted by a Knox County jury of first degree premeditated murder and received a sentence of life imprisonment. Id. at *15. The Petitioner appealed, arguing that the evidence was insufficient to support his conviction and that the trial court erred in denying the motion to suppress his statements to law enforcement. Id. at *15-23. On direct appeal, this court affirmed the Petitioner's convictions, and the Tennessee Supreme Court denied his application for permission to appeal. Id. at *23.

Thereafter, the Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended post-conviction petition, alleging in pertinent part that trial counsel was ineffective in failing to impeach Joseph Merrell adequately with the statement Merrell gave to law enforcement; that appellate counsel was ineffective in failing to raise as an issue on appeal the exclusion/limitation of testimony by Dr. James Murray regarding the Petitioner's "blackouts" related to his alcohol consumption; that appellate counsel was ineffective in failing to raise as an issue on appeal that the Petitioner's involuntary statements constituted a due process violation not subject to harmless error analysis; and, finally, that trial counsel was ineffective in failing to raise an issue in the motion for new trial that the Petitioner should have been granted relief due to cumulative error and that appellate counsel was ineffective in failing to raise as an issue on appeal that the Petitioner should have been granted relief due to cumulative error.

At the post-conviction hearing, the Petitioner testified that appellate counsel did not adequately impeach the State's witness, Joseph Merrell, with Merrell's allegedly inconsistent statement that he made to the homicide detectives. He asserted that the State's pretrial discovery included this statement by Merrell, wherein Merrell told the detectives that he left the Petitioner's grandmother's home because he was tired and ready to leave, and when the victim refused to leave with him, Merrell left the home. However, at trial, he claimed Merrell testified that the Petitioner told Merrell "he had to leave" and that the Petitioner "wasn't allowing [Merrell] to speak to the victim," which was inconsistent with Merrell's prior statement to law enforcement. The Petitioner asserted that although Merrell's testimony was different from his prior statement to the detectives, trial counsel never cross-examined or impeached Merrell regarding this discrepancy. He also stated that Merrell's testimony at trial was "later used by the appellate court to uphold [his] conviction."

The Petitioner also asserted that after appellate counsel was appointed, he never spoke with him about what issues should be included in the motion for new trial. He also said that appellate counsel never sent him a copy of the motion for new trial before it was heard by the trial court. However, the Petitioner acknowledged that his grandmother sent him a copy of the motion for new trial right after this motion had been denied by the court. He asserted that upon reviewing the motion for new trial, he believed that appellate counsel should have included issues regarding the trial court's limitation of Dr. Murray's expert testimony and cumulative error. The Petitioner explained that cumulative error should have been included in the motion for new trial because there were "so many small things that happened that in and of [them]sel[ves], it probably wasn't enough, but when you take a good look at the whole picture, there w[ere] just so many mishaps and things that didn't go . . . right."

The Petitioner claimed that appellate counsel never discussed the issues that needed to be raised on appeal and never told him at any point prior to filing his appellate brief what issues that he planned to raise. He claimed that appellate counsel never sent him a copy of his appeal brief. The Petitioner acknowledged that the only two issues raised on appeal were that his Miranda rights had been violated when he gave his statements to law enforcement and that there was insufficient evidence of premeditation to sustain his conviction.

The Petitioner asserted that no issue regarding the limitation of Dr. Murray's testimony was raised on appeal, even though he believed Dr. Murray's testimony was relevant to his "only form of defense." He explained that Dr. Murray was a psychologist who performed several tests on him and to whom he disclosed his "history with alcohol and drugs." He claimed that if the trial court would have allowed it, Dr. Murray would have testified that "certain brain functions are limited or are not present when someone's brain is under that much alcohol and drugs."

The Petitioner claimed trial counsel started to object to some of the photographs from the crime scene and the autopsy and then "withdrew the objection and pretty much gave up." He felt that trial counsel should have pursued this issue because "a lot of the photos were just unnecessarily gruesome and . . . would . . . prejudice me with the jury[.]" He asserted that there were "a lot" photographs depicting the victim's "head bashed in[,]" which were particularly prejudicial, and he claimed that some of these photographs made the jurors cry. The Petitioner also noted that there was testimony from a medical expert describing the injuries to the victim, which also made admission of the photographs unnecessary.

The Petitioner acknowledged that appellate counsel "did a fairly good job of . . . arguing the whole Miranda issue." He noted that the Court of Criminal Appeals concluded

that his Miranda rights had been violated but that it was "harmless error." He added that the court specifically concluded that the Miranda violation was a "non-structural constitutional violation, which deemed it available for . . . harmless error analysis." The Petitioner asserted that appellate counsel should have argued that when the officers violated his Miranda rights, they also violated his due process rights and that "since [appellate counsel] left the due process [argument] out, maybe that's why [the appellate court] called it a non-structural constitutional violation" subject to harmless error analysis.

On cross-examination, the Petitioner acknowledged that the Court of Criminal Appeals held that even though there was a problem with his statement, there was overwhelming evidence of his guilt. He agreed that the court found that even if his statement had been suppressed, he made a 9-1-1 call wherein he admitted to killing the victim. He also acknowledged making an earlier 9-1-1 call, wherein he reported that the victim had hit him, that he had argued with the victim, and that he had threatened to kill the victim. The Petitioner said the court also stated that there were at least three witnesses, Mr. Merrell, Mr. Kuzne, and Mr. Wallace, who testified at trial that the Petitioner and the victim had fought before they arrived at the Petitioner's grandmother's home. The Petitioner acknowledged that the court also found that these witnesses testified that the Petitioner had been calm about the previous fight with the victim, had urged them to leave, had encouraged the victim to stay at his home, and had stated that he would not fight with the victim anymore, which was why the witnesses felt comfortable leaving the home.

Despite these admissions, the Petitioner claimed that the Court of Criminal Appeals "didn't have the whole story" and only had "what was said at trial." He claimed "the jury . . . didn't hear [that State's witnesses'] stories had changed." The Petitioner asserted that the day after the murder, the witnesses said that they "were tired" and "were ready to go home" and that after they "asked the victim if . . . he was going with them . . . , they left." When asked whether the witnesses' testified similarly at trial, the Petitioner replied, "No, their testimony at trial was that . . . I made them leave, that I was wanting them to leave, and I wouldn't let them speak to the victim and [that I was] urging them to leave, that everything was going to be all right." When he was asked whether witnesses sometimes elaborated on statements they have given, the Petitioner asserted that these witnesses "didn't elaborate" on their statements, they "changed" them. The Petitioner later acknowledged that Joseph Merrell was the only witness who changed his story at trial. When the State asked the Petitioner whether he was arguing that if trial counsel had cross-examined Merrell with Merrell's prior statement to detectives, then it would have made a difference in the verdict in his case, the Petitioner said, "Maybe not just that singular issue." The Petitioner reiterated that Merrell's story changed to show that the Petitioner was "trying to form some type of plan [to kill the victim]" by "trying to get them to leave and keep the victim there[.]" When the State suggested that Merrell just added information to his original statement to police, the Petitioner disagreed, stating that Merrell's "story

- 4 -

completely changed" because his prior statement had not contained any information "of that nature."

The Petitioner begrudgingly acknowledged that his defense at trial was that he was so intoxicated that he was not capable of forming premeditation. He also admitted that trial counsel cross-examined the witnesses and tried to get them to admit that they all had consumed a lot of alcohol that evening. He also agreed that trial counsel had the witnesses acknowledge that the victim had been drinking that night and that the victim had assaulted the Petitioner earlier that night. When asked whether trial counsel had made a decision to focus on the facts the witnesses could testify to that were favorable to him, the Petitioner responded, "[Trial counsel] was trying his best to shoot from the hip" and "literally knew nothing of the case" and "was just using what was being said in the moment and going with that." When the State asked if the Petitioner was trying to read trial counsel's mind, the Petitioner acknowledged that he "probably" was. The Petitioner then asked whether trial counsel was "here today" so he could "ask him," and the State said that trial counsel was not present for the hearing. The Petitioner admitted that he never informed the trial court that he believed he was not getting adequate representation. He claimed that he "wasn't aware until about a day, a full day into trial" that trial counsel was ill-prepared and that was when trial counsel repeatedly called the victim by the wrong name. Although the Petitioner acknowledged that the victim's last name, Gradillas, was unusual and difficult to pronounce, he claimed that trial counsel "didn't misspeak the victim's name . . . he didn't know the victim's name." The Petitioner acknowledged that he had declined a plea deal to enter a guilty plea to second degree murder, although he now wished he had accepted that offer.

The Petitioner acknowledged that Dr. Mileusnic-Polchan testified at trial that the victim had suffered catastrophic injuries to his head, that the victim had at least forty-five different wounds to his skull and face, and that the victim had defensive wounds on his hands. The Petitioner also admitted that the crime scene technicians found the victim, who was wearing only his underwear, wrapped up in a comforter "[a]s if asleep" and that he had thrown a bunch of things on top of the victim's body after the killing. He agreed that the State's argument at trial was that the crime scene looked staged because the china cabinet and the television were not damaged; however, he claimed his grandmother had to pay thousands of dollars to fix the mess that was made. The Petitioner asserted that the Court of Criminal Appeals heard his suppression issue and found that although there was an issue with his statement, there was overwhelming evidence of his guilt. However, the Petitioner asserted that if he had been represented by a competent attorney, the "overwhelming" evidence of his guilt could have been challenged at the proper time. When the State asked him how impeachment of Merrell with his prior statement would have changed the evidence regarding the crime scene and the victim's body, the Petitioner

asserted that "Merrell's statement was used as overwhelming evidence to uphold [his] conviction[.]"

The Petitioner asserted that appellate counsel was ineffective in failing to raise on appeal the trial court's limitation of Dr. Murray's testimony, the due process issue associated with the Miranda violation, and the "cumulative error of everything." He admitted that there were several witnesses who testified against him at trial and that he made several phone calls to 9-1-1 before the homicide, although he claimed he did so because the victim assaulted him. He also acknowledged that he talked to officers before he contacted law enforcement to tell them that he killed the victim. The Petitioner agreed that there were a lot of people who saw him and interacted with him on the night of the victim's murder.

On redirect examination, the Petitioner asserted that Merrell's testimony at trial provided evidence from which the jury could infer the Petitioner's intent. He claimed that if Merrell's credibility had been challenged at trial, then it might have changed the jury's verdict. Merrell's statement to law enforcement and portions of the trial transcript related to whether Dr. Murray would be allowed to testify were admitted as exhibits during the hearing. The Petitioner acknowledged that appellate counsel raised the Miranda issue on appeal, and the appellate court agreed there was a Miranda violation but concluded that it was a non-structural constitutional error. However, he asserted that appellate counsel should have raised other issues on appeal, including the trial court's decision not to allow the jury to hear Dr. Murray's testimony, that appellate counsel failed to raise.

The State called appellate counsel to testify at the post-conviction hearing. Appellate counsel stated that he represented the Petitioner at the motion for new trial and on appeal to the Court of Criminal Appeals. He stated that when he was appointed to represent the Petitioner, trial counsel's co-counsel had already filed a motion for new trial, and he reviewed this motion and the transcript from trial and then talked to co-counsel about the Petitioner's case. Appellate counsel said that "early in the process" he sent the Petitioner a letter and explained the issues in the case, several of which the Petitioner was aware, perhaps because he had received a copy of the motion for new trial. Appellate counsel also discussed the Petitioner's case with his grandmother in person and provided his grandmother with printed transcripts of the trial that she had requested. He noted that the Petitioner's grandmother was "very active, very interested in the [Petitioner's] case" and "desperately wanted to be kept up-to-date," so he "met with her for quite a while in person" and "talked about the case."

Appellate counsel said that he continued to review the trial transcripts and considered the legal issues raised in the previously filed motion for new trial. He also reviewed Dr. Murray's report that he received from the Petitioner's previous attorney.

Appellate counsel acknowledged that he never discussed the Petitioner's case with trial counsel. He noted that trial counsel "had a lot of resources with his firm and would deploy those resources at trial" and had "a lot of people involved in preparing a . . . trial defense." Appellate counsel said that he ultimately "ended up relying on the issues [co-counsel] had identified" in the motion for new trial. He acknowledged that he argued some issues at the motion for new trial hearing that he did not raise on appeal.

Appellate counsel said that Dr. Murray's testimony on the issue of premeditation "would clearly not have been admissible at trial." He also asserted that it would have been difficult to raise the issue regarding the trial court's limitation of Dr. Murray's testimony on appeal because he did not believe "there was a pretrial hearing where Dr. Murray actually testified." He said that the only indicator of what Dr. Murray's testimony would be were the conclusions Dr. Murray made in his report and he "didn't know what [Dr. Murray's] testimony would have actually been to the jury." Appellate counsel said that Dr. Murray, in his report, never opined that the Petitioner had a mental disease or defect that made him incapable of forming premeditation and that pursuant to Tennessee law at that time, Dr. Murray "would not have been able to testify [at trial] on the question of premeditation." Appellate counsel noted that the trial court actually ruled that it would allow Dr. Murray to testify "regarding the effects of intoxication but not about premeditation[,]" which meant that although the trial court limited Dr. Murray's testimony, it did not completely exclude it. He said that after the trial court made its ruling, "the defense did not elect to call Dr. Murray at trial," which meant that he was not a witness at trial, although he could have been. Appellate counsel asserted that there was no way for him to argue on appeal that the trial court's ruling was wrong, given the conclusions Dr. Murray made in his report and the state of Tennessee law on that issue.

Appellate counsel said that trial counsel's defense at trial was that there was no premeditation and that the Petitioner committed a "sudden, spontaneous crime of passion." He said that some of the crime scene photographs and even the autopsy photographs were "at least not inconsistent" with the theory that the Petitioner committed the crime in a state of passion. He said that if the defense had called Dr. Murray, he could have testified about "the general effects of intoxication" but would have been subject to cross-examination by the State "about the effects of intoxication on . . . a person's judgment and actions."

Appellate counsel said he did argue "in the brief . . . that [the Petitioner] had a due process right to remain silent[] and that the police violated those rights in obtaining some of those statements from him." He said the Court of Criminal Appeals "agreed that [the Petitioner's] due process rights were violated" but ultimately concluded that it was "harmless error under the facts of this case" because of the overwhelming evidence of the Petitioner's guilt.

On cross-examination, when asked if he recalled specifically raising an issue related to the suppression hearing regarding the violation of the Petitioner's due process rights, appellate counsel replied,

> I did in my brief raise and argue that [the Petitioner's] constitutional rights to due process—his constitutional rights to remain silent were violated by the police and that . . . his statement was not voluntary. The whole reason that it matters as to whether his statement was voluntary or not, are his due process constitutional rights to remain silent, and that's part of what <u>Miranda</u> is, and I argued . . . some cases that have to do with . . . whether a statement is voluntary or not and when [a suspect] can be questioned after he's told the police he doesn't want to talk to them.

When asked if he would agree that the Court of Criminal Appeals did not frame its response in terms of a due process violation, appellate counsel said,

> I don't know how many times they . . . specifically said . . . due process, but they referred to [the Petitioner's] <u>Miranda</u> rights and . . . his right to be advised that he has the right to remain silent and also his . . . actual right to remain silent which . . . essentially are due process rights.

> . . . .

> . . . [T]hey may not have used the phrase due process. What they were talking about were his due process rights to remain silent[,] and they concluded that those were violated, just that ultimately it was harmless error.

Appellate counsel asserted that there were "some photos . . . the State elected not to use" and there were "some photos that the defense did not object to, and I don't recall whether the [c]ourt actually ruled against the State in telling the State that it was not going to allow certain specific photos that the State wanted to use." He added that he did not believe he could "determine from the transcript . . . which specific photos . . . the trial court ruled on" although he thought that the transcript would show "whether the trial court actually excluded any . . . particular photos or not based on what the trial court said in the transcript."

When he was asked about the basis for the trial court's limitation of Dr. Murray's testimony, appellate counsel said that the trial court followed Tennessee law, which stated that unless Dr. Murray concluded that the Petitioner had a mental disease or defect that made him incapable of forming premeditation, Dr. Murray's testimony on premeditation would not be relevant and therefore not admissible at trial. Appellate counsel said that part

of what the defense wanted to ask Dr. Murray about was whether the Petitioner had alcohol-induced dementia. He noted that if Dr. Murray talked about the Petitioner having cognitive limitations in executive functioning in his report, then there was a "difference in concluding that [the Petitioner had] cognitive limitations and in concluding that [the Petitioner] was incapable of forming premeditation." He reiterated that the law in effect said that expert testimony that a defendant's cognitive limitations just "impacted his ability or reduced his ability to form premeditation" would not be admissible.

Following the hearing, the post-conviction court entered an order denying relief. Thereafter, the Petitioner filed a timely notice of appeal.

## **ANALYSIS**

On appeal, the Petitioner argues that trial counsel provided ineffective assistance in failing to impeach Joseph Merrell with Merrell's prior inconsistent statement; that appellate counsel provided ineffective assistance in failing to raise on appeal the trial court's limitation/exclusion of Dr. Murray's testimony; that appellate counsel provided ineffective assistance in failing to raise on appeal that the Petitioner's illegally obtained statements constituted a due process violation not subject to harmless error analysis; and that the multiple errors committed by trial counsel and appellate counsel constituted prejudicial error in the aggregate. In response, the State argues that the post-conviction court properly denied relief. We agree with the State.

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents mixed questions of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). A post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, we generally defer to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Mobley, 397 S.W.3d at 80 (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)). However, we review a post-conviction court's application of the law to its factual findings de novo without a presumption of correctness. Id. (citing Grindstaff, 297 S.W.3d at 216; Finch v. State, 226 S.W.3d 307, 315 (Tenn. 2007); Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006)).

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) this deficient performance

prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

**I. Impeachment of a State Witness.** First, the Petitioner argues that trial counsel was ineffective in failing to impeach Joseph Merrell at trial with Merrell's statement to law enforcement, which the Petitioner claims was a prior inconsistent statement. He contends that given the critical testimony Merrell provided on the issue of premeditation, it was "prejudicial for trial counsel to fail to use all of the available 'tools in the toolbox' to discredit the testi[mony] of this essential prosecution witness." Although the Petitioner acknowledges that it is difficult to prove prejudice where the proof of guilt is overwhelming, he asserts that the proof of premeditation, as opposed to proof that he killed the victim, was not overwhelming. Accordingly, he claims that trial counsel's failure to impeach Merrell with his prior inconsistent statement "cannot be anything but prejudicial."

In his January 15, 2011 statement to police, Merrell stated that sometime after 3:00 a.m. he and Blake Wallace got a ride to the Petitioner's grandmother's home. When they arrived, the Petitioner and the victim were pulling into driveway of the house around the same time. Merrell noted that the Petitioner was not wearing a shirt and the Petitioner's

head was "busted" and "swollen." The Petitioner said he and the victim "got into it[,]" and the victim replied, "You did it to yourself, man," and "Look at my hands, I didn't even hit you[.]" Merrell said that he and his friends had gotten separated from the Petitioner and the victim earlier that night and that he did not know where the Petitioner and the victim had gone before he saw them back at the Petitioner's grandmother's home after 3:00 a.m. Merrell remembered the Petitioner saying around 4:00 a.m. that the victim beat him up but it was not a big deal and that if it mattered to him, he would kick everybody out of his house, but he did not care. Merrell said that he stayed at the Petitioner's grandmother's home for fifteen minutes before leaving. He added that the Petitioner "seemed like he was . . . fine when [Merrell and Wallace] left" even though the Petitioner was "really drunk."

Merrell said Wallace stated that "maybe [the Petitioner] was trying to hit on [the victim] or something," which was why the victim hit the Petitioner. However, Merrell said he did not know what happened between the men and thought Wallace was "just saying that or whatever." Merrell asserted that the victim was not gay. He then said, "It's weird that [the Petitioner and the victim] got back into it . . . because I didn't think they were going to . . . fight or whatever[.]" When Merrell left the home, he thought that the victim was "going to stay there and . . . get a ride from somebody." He denied seeing a physical confrontation between the Petitioner and the victim. Merrell stated that the victim was awake when he and Wallace told him they were leaving and that the victim "was kind of wanting to go back with [them]," but Merrell "wasn't going to take [the victim] all the way back to Knoxville" so Merrell and Wallace "just ended up leaving." Merrell guessed that the victim "was going to have his girlfriend . . . pick him up the next day."

At trial, Merrell testified that he and Wallace got a ride to the Petitioner's grandmother's house around 3:30 a.m. on January 15, 2011. He said that he and Wallace hung out for a little while with the Petitioner, the victim, and Jordan Kuzne. Although everyone had initially talked about spending the night, Merrell and Wallace decided to not spend the night there because there was more room at Wallace's home and they felt more comfortable there. Before they left, Merrell said that "everybody seemed very normal except the [Petitioner]." He noted that the Petitioner and the victim had already had a fight and that the Petitioner had a "big knot on his head" but was "very adamant" about trying to get Merrell and Wallace to leave." Merrell also said that the Petitioner was "very adamant" about the victim staying because the victim already had plans to have his seven-months pregnant girlfriend to come and pick him up to shop for baby clothes later that day. He said the Petitioner would not allow the victim to talk to him or Wallace "about why they got into a fight" and the Petitioner kept saying, "[The victim] busted my head. We're friends. It's no big deal."

Merrell said he asked two or three times, "You guys are not going to fight if we leave?," and the Petitioner "continued to assure us . . . and continue[d] not to allow [the

victim] to separate to tell us what had happened." He added that the Petitioner was "just very cool and collected" and kept "telling us it was okay, [the victim] can stay here, and was trying to separate us to where we could not talk to [the victim]." Merrell said that "at the very last moment the victim decided to stay, only because his girlfriend was picking him up" later that day and she knew where the Petitioner lived but did not know where Wallace lived. Merrell stated that at that time, the Petitioner did not seem intoxicated to the point that he was slurring his words and was not stumbling as he walked. He noted that while the Petitioner was not angry at all, the Petitioner "was very loud and . . . continued to not want [the victim] to speak[,]" which gave Merrell a "very weird, eerie feeling."

At the time, the victim was "trying to hide . . . whatever had happened" because the Petitioner would not allow him to speak to them, and the victim was "not wanting whatever happened to be known or clear to [them]." Merrell explained that the victim did not have a cell phone or a car at that time. He said that although the victim was acting normally earlier that night, once they got back to the Petitioner's grandmother's home at 3:30 a.m., the victim, though not angry, was not acting like himself and did not appear "comfortable at all." Before Merrell and Wallace left, the victim told them that he was "going straight to bed." Merrell denied that the victim was homosexual and said that the victim was "[n]ot homophobic at all." On cross-examination, Merrell acknowledged that everyone began drinking at 9:30 p.m. and that they later smoked some marijuana. He said he was unaware that the Petitioner had called 9-1-1 earlier that night to report that the victim hit him.

At the post-conviction hearing, the Petitioner failed to call trial counsel or Joseph Merrell to testify. The Petitioner testified that trial counsel failed to impeach Joseph Merrell with the allegedly inconsistent statement Merrell made to law enforcement. He asserted that Merrell's story changed to show that the Petitioner was "trying to form some type of plan [to kill the victim]" by "trying to get [his friends] to leave and keep the victim there[.]" He argued that even though Merrell's testimony was drastically different from his statement to officers, trial counsel never cross-examined or impeached Merrell regarding this discrepancy.

In its order denying relief, the post-conviction court did not address the deficiency prong of Strickland because it concluded that the Petitioner failed to establish the prejudice prong. The court acknowledged that Merrell's trial testimony "cast the events beginning around 3:30 a.m. on the morning of the crime in a different light than his account in his initial statement to police." However, it held that "this did not necessarily mean . . . that he perjured himself at trial or that there was not an innocent explanation for his omission of these facts in his initial statement." The court noted that Merrell's initial statement was "given hours after the offense following a long night of heavy drinking" and was "given at a time where he was still processing the violent death of his best friend." It then concluded that there was "no indication, a[t] least by a clear and convincing standard, that a line of

- 12 -

inconsistent-statement impeachment would have caused him to change his testimony or [would have] cause[d] the jury to accredit his testimony in a different way." Lastly, the post-conviction court concluded that the Petitioner was unable to establish prejudice in light of the overwhelming evidence that the Petitioner acted with premeditation:

> [T]here was a plethora of evidence in this case, independent of Mr. Merrell's testimony, that fully supported the jury's conclusion that the [P]etitioner acted intentionally and with premeditation. Ms. Savage, for instance, heard the [P]etitioner tell the victim an hour or so before the murder that "I'm gonna kill you." The 911 recording shows that [at] 2:27 a.m., the [P]etitioner threatened the victim by saying, "I will kill your ass," and that he was going to "kill you, bitch." At 5:37 a.m., the [P]etitioner left his girlfriend a voicemail message wherein he admitted to killing someone. A few hours later, the emotionless [P]etitioner informed a 911 operator that he had killed a man. Mr. Wallace testified that the [P]etitioner and victim were not angry at one another when they arrived back a[t] Ms. Pike's house and that, while they had been drinking, the [P]etitioner was not "extremely intoxicated." Other witnesses, including Ms. Maner and Mr. Kuzne, testified that the situation was not tense between the [P]etitioner and the victim following their initial altercation. The jury could conclude from this testimony that, even if [the Petitioner] was in a state of passion or excitement immediately following his fight with the victim, the petitioner's passion had subsided by the time that he actually killed [the victim,] Mr. Gradillas. See State v. Bullington, 532 S.W.2d 556, 559-60 (Tenn. 1976). The brutal nature of the attack, including the repeated blows to the victim while he lay on a sofa, is proof of the [P]etitioner's intent to cause the victim's death.

> This proof clearly and overwhelming[ly] shows that the [P]etitioner, after becoming upset with the victim following their initial altercation, calmed down for a period of a couple of hours before perpetrating a brutal assault that resulted in the victim's death. In light of this overwhelming proof of the [P]etitioner's guilt, there is no probability that a more effective cross-examination of Mr. Merrell would have resulted in a different verdict.

The record fully supports the post-conviction court's findings of fact and conclusion of law as to this issue. We note that the Petitioner never called trial counsel to testify. Although the Petitioner suggests that the absence of trial counsel's testimony on this issue works to his advantage, the Petitioner has the burden of proof in a post-conviction case, and he failed to show how he was prejudiced by trial counsel's failure to impeach Merrell with his statement to law enforcement, particularly in light of the overwhelming evidence that the Petitioner acted with premeditation. Even more importantly, the Petitioner failed

to present Joseph Merrell at the post-conviction hearing, which prevented the Petitioner from showing how impeachment of Merrell with his statement would have affected the outcome of trial. The proof at trial included the Petitioner's admissions during the 2:27 a.m. 9-1-1 call that the victim had hit him and that he was going to kill the victim; the victim's body, which was dressed for sleeping, found wrapped in a comforter; multiple objects found around the victim's body, including a heater as well as twenty- and sixteen-pound dumbbells covered in the victim's blood; forty-four injuries to victim's face; the unarmed victim; and the Petitioner's calm demeanor at the time of arrest, which was supported by the Petitioner's 8:17 a.m. 9-1-1 call admitting he had killed someone. See id. at *1-3, *7-9, *13-14. Because the Petitioner has not shown that trial counsel's failure to impeach Merrell with his statement was prejudicial, he is not entitled to relief.

**II. Defense Expert.** Second, the Petitioner contends that appellate counsel was ineffective in failing to raise on appeal the trial court's limitation of Dr. James Murray's testimony regarding alcohol-induced dementia as a defense to premeditation. The Petitioner asserts that because his defense at trial was that he lacked the requisite mental state for first degree premeditated murder, Dr. Murray's testimony was relevant to this defense, and appellate counsel's failure to raise this issue on appeal was ineffective. See State v. Scott, 275 S.W.3d 395, 410-11 (Tenn. 2009) ("Where expert testimony is merely an iteration of what would be within the jurors' common sense, the admission of such evidence does not assist, much less substantially assist, the trier of fact to understand the evidence or determine a fact at issue."). He claims that Dr. Murray's testimony, namely that the Petitioner's mental deficiencies were not a particular emotional state or mental condition but were part of a disease or defect that was not transient, would have substantially assisted the jury on whether he had the ability to form premeditation. Consequently, he claims the trial court erred in preventing the jury from learning "scientifically sound information that would assist—not supplant—them in their role." Accordingly, the Petitioner argues that appellate counsel's failure to raise this issue on appeal constituted ineffective assistance of counsel.

Prior to trial, the Petitioner's trial counsel filed a Notice of Intent to Rely Upon Defense of Mental Disease or Defect, based apparently on the defense's intent to present testimony from Dr. James Murray, a licensed clinical psychologist. At trial, the State noted that the defense had given it a copy of Dr. Murray's report but had provided none of the underlying data, including raw test scores, upon which Dr. Murray relied to make his report. The State asserted that it was entitled to cross-examine Dr. Murray and would need this underlying data in order to do so, and the trial court agreed that the State was entitled to this information. Dr. Murray's report was admitted for identification purposes so the trial court could review it prior to the defense having Dr. Murray testify. In this report, Dr. Murray opined that the Petitioner's "pattern of gross alcohol and drug use [was] consistent

with the types of use likely to trigger substantial neuropsychological dysfunction as reflected in his reported pattern of blackouts."

In addition, Dr. Murray stated in his report that the Petitioner's "memory and other cognitive impairments for the events in and around the time of the charge[d] offense [were] also consistent with neuropsychological deficits associated with alcohol[-]induced cognitive impairments . . . ." During a later jury-out hearing, the trial court held that while Dr. Murray would be "welcome to testify as to the [Petitioner's] impairment of the cognitive function of memory," it would not permit Dr. Murray to offer testimony regarding "other types of cognitive impairment, specifically to planning, organizing, sequencing, and abstracting" because Dr. Murray never made a finding that these cognitive impairments "actually [were] present with [the Petitioner]." The court also said that it would "not permit counsel . . . to examine [Dr. Murray] with respect to the statement the [Petitioner] made to police" because the weight the jury should give to the Petitioner's statement was "uniquely the province of the jury" and the court would not permit "either side to try to use a doctor to bolster or attack the reliability of the statement or the weight given to it." Thereafter, the defense rested its case without calling Dr. Murray.

The Petitioner claimed the trial court erred in limiting/excluding Dr. Murray's testimony in his motion for new trial and attached Dr. Murray's report to the motion. At the hearing on this motion, the trial court asserted that Dr. Murray was unable to opine that the Petitioner was "incapable of premeditating[,]" which was why it held that Dr. Murray's testimony "was not sufficiently relevant to get to the jury." The trial court then denied the motion for new trial.

Thereafter, the Petitioner argued in his amended petition for post-conviction relief that appellate counsel was ineffective in failing to raise on appeal the trial court's limitation of Dr. James Murray's testimony. At the post-conviction hearing, the Petitioner never called Dr. Murray to show how his testimony would have affected the outcome of trial. When asked about his failure to raise this issue on direct appeal, appellate counsel explained that he did not raise the issue on appeal because he did not believe Dr. Murray's testimony was admissible on the issue of premeditation. The post-conviction court, in denying relief, held that appellate counsel was not deficient in failing to raise this claim on appeal because Dr. Murray's proffered testimony that the Petitioner "likely" had "neuropsychological impairments" was "exactly the type of testimony that is forbidden by Hall and its progeny." See State v. Hall, 958 S.W.2d 679, 689-90 (Tenn. 1997) (concluding that "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law" and emphasizing that this "psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental

condition"). The record fully supports the post-conviction court's conclusion on this issue because Dr. Murray's report never stated that the Petitioner lacked the capacity to form premeditation, as required by Hall. Because the Petitioner has not shown that appellant counsel's failure to raise this issue was deficient, he is not entitled to relief.

**III. Due Process.** Next, citing Murphy, the Petitioner asserts that appellate counsel was ineffective in failing to raise on appeal that his involuntary confession resulted in a due process violation, which is not subject to harmless error analysis. See Murphy v. City of Tulsa, 950 F.3d 641, 652 (10th Cir. 2019) ("Miranda requires a warning before a custodial interrogation, and the right to due process extends beyond Miranda to ensure that the confession is voluntary.").

In Murphy, the plaintiff sued the City of Tulsa under 42 U.S.C. § 1983, alleging that a police officer had violated the Constitution by coercing her confession and that the City of Tulsa had incurred liability for this constitutional violation. Id. at 643. In part, the plaintiff claimed the city was liable because the police department failed to teach the constitutional limits of interrogations. Id. at 652. The plaintiff asserted that a 1987 legal bulletin, which instructed officers how to apply Miranda and how to interrogate suspects, only served to tell officers how to provide Miranda warnings, not how to ensure that a confession is voluntary. Id. The Tenth Circuit stated, "These are two distinct constitutional inquiries: Miranda requires a warning before a custodial interrogation, and the right to due process extends beyond Miranda to ensure that the confession is voluntary." Id. The court, noting that the bulletin contrasted the admissibility of coerced confessions with confessions obtained in violation of Miranda, concluded that the bulletin addressed both Miranda and the right to due process. Id. at 653. After determining that the city had presented proof that it had taught officers how to interrogate suspects and had updated officers on the relevant legal decisions, the Tenth Circuit held that a fact-finder could not reasonably infer that future constitutional violations would be highly predictable or plainly obvious for the purpose of proving "deliberate indifference" by the city. Id. at 655.

At the motion for new trial, the Petitioner argued that the trial court erred in denying his motion to suppress the two statements he made to law enforcement on the grounds that he had invoked his right to remain silent and was unable to make a knowing and voluntary waiver of his rights under Miranda. At the motion hearing, the trial court held that the Petitioner's statements were voluntary because the Petitioner "initiated the contact [with the police]" and "[t]here was no request to see a lawyer, no attempt by the [Petitioner] to quit talking." On direct appeal, the Petitioner, with the assistance of appellate counsel, argued that the trial court had erred in denying his motion to suppress his statements because he was questioned after invoking his right to remain silent. See Steven Jeffrey Pike, 2017 WL 363283, at *17. This court held that the State failed to prove by a preponderance of the evidence that the Petitioner voluntarily waived his right to remain

- 16 -

silent. Id. at *22. The court then concluded that although the Petitioner's statements to the detectives should have been suppressed, the error was harmless beyond a reasonable doubt in light of the overwhelming proof of the Petitioner's guilt. Id. at *22-23.

At the post-conviction hearing, the Petitioner testified that appellate counsel should have argued that his due process rights, not just his right against self-incrimination, were violated, which would have required automatic reversal. Appellate counsel asserted that he did argue "in the brief [on direct appeal] that [the Petitioner] had a due process right to remain silent, and that the police violated those rights in obtaining some of those statements from him."

The post-conviction court, in denying relief, concluded that the Petitioner had failed to show that appellate counsel was deficient in not raising the due process issue on appeal. The court initially recognized that "a long line of cases" had held that "the erroneous admission of evidence obtained in violation of a defendant's Miranda rights is a non-structural constitutional error, and as such, is subject to harmless error analysis." It then held that although the Petitioner asserted that "appellate counsel should have argued that his due process rights were violated, not merely his right against self-incrimination, [which] would have . . . elevated the infirmity to the level of a constitutional structural error, thereby necessitating automatic reversal," the Petitioner had failed to identify, and the court had been unable to find "any authority to support this novel argument."

We conclude that well-established precedent shows that the admission of involuntary confessions are subject to harmless-error analysis, regardless of whether they are admitted in violation of Miranda or due process. See, e.g., Neder v. United States, 527 U.S. 1, 18 (1999) ("The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination, and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment are both subject to harmless-error analysis under our cases" (citations omitted)); Arizona v. Fulminante, 499 U.S. 279, 295-96 (1991) (majority concluded that the harmless error rule adopted in Chapman v. California, 386 U.S. 18, (1967), was applicable to the admission of coerced confessions that violate due process); State v. Climer, 400 S.W.3d 537, 569-70 (Tenn. 2013) (holding "[t]he erroneous admission of evidence obtained in violation of a defendant's Miranda rights is a non-structural constitutional error, and as such, is subject to . . . harmless error analysis"); State v. Bates, 804 S.W.2d 868, 876 (Tenn. 1991) (concluding that admission of the defendant's statement that was obtained in violation of the defendant's Fifth Amendment right to counsel, was harmless beyond a reasonable doubt); State v. Koffman, 207 S.W.3d 309, 320 (Tenn. Crim. App. 2006) (holding that the erroneous admission of statements in violation of the defendant's Fifth Amendment right to counsel was harmless beyond a reasonable doubt given the substantial evidence of the defendant's guilt); Franklin v. Bradshaw, 545 F.3d 409, 415 (6th Cir. 2008)

(concluding that any error in determining that the defendant did not invoke his right to remain silent during the interview would be subject to harmless error review); see also State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (holding that while structural constitutional errors require automatic reversal, non-structural constitutional errors are subject to a harmless error analysis) (recognizing that structural constitutional errors "compromise the integrity of the judicial process itself" and include "the complete denial of the right to counsel, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, and denial of the right to a trial by jury").

Based on the authorities listed above, we conclude that admission of the Petitioner's involuntary confession was not a structural constitutional error requiring automatic reversal. Because the Petitioner has not shown that appellant counsel was deficient in failing to raise this argument on appeal, he is not entitled to relief.

**IV. Cumulative Error.** Lastly, the Petitioner contends in his brief that "the multiple errors of trial counsel and/or appellate counsel that were addressed in the post-conviction hearing . . . constituted prejudicial error in the aggregate." However, in his post-conviction petition, the Petitioner phrased the cumulative error issue quite differently, arguing that "trial counsel . . . failed to raise as an issue in the [m]otion for a new trial that your Petitioner should have been granted relief due to cumulative error" and that "appellate counsel . . . failed to raise as an issue on appeal that your Petitioner should have been granted relief due to cumulative error." The Petitioner's appellate brief focuses on how trial counsel's and appellate counsel's deficient performance, when viewed in the aggregate, caused him prejudice. However, his post-conviction petition concentrates on how trial counsel was ineffective in failing to raise cumulative error as an issue in the motion for new trial and how appellate counsel was ineffective in failing to raise this same issue on appeal.

The cumulative error doctrine "is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. Id. at 77.

Initially, we must consider the Petitioner's claim in his brief, which was raised for the first time on appeal, namely that multiple deficiencies of trial counsel and/or appellate counsel resulted in "prejudicial error in the aggregate." Even if trial counsel were somehow deficient in failing to impeach Joseph Merrell with Merrell's statement, which we feel the Petitioner failed to demonstrate at the post-conviction hearing, the Petitioner has certainly failed to establish on post-conviction that trial counsel and appellate counsel committed

more than one error resulting in "prejudicial error in the aggregate." Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief based on this argument.

Next, we must consider the Petitioner's claim that he presented to the post-conviction court but did not raise on appeal, namely that trial counsel failed to raise cumulative error as an issue in the motion for new trial and that appellate counsel failed to raise this same issue on appeal. In considering this claim, the post-conviction court recognized that the issues raised in the Petitioner's motion for new trial were the sufficiency of the evidence, the admission of photographs of the victim's body, the trial court's denial of the motion to suppress, and the trial court's limitation of Dr. Murray's testimony. It noted that of the issues raised in the motion for new trial, the only error was the trial court's denial of the motion to suppress because the remaining issues were "meritless." It then held that because "[t]he existence of a single error in the record does not call for a showing of cumulative error that would necessitate the reversal of the [P]etitioner's judgment," trial counsel was not deficient for failing to raise cumulative error in the motion for new trial. Regarding appellate counsel's failure to raise cumulative error as an issue on appeal, the post-conviction court likewise held that because "the [P]etitioner has failed to show a multiplicity of errors in the record of this case," appellate counsel "was not deficient for failing to raise the issue of cumulative error on direct appeal." The record fully supports the post-conviction court's conclusions. Therefore, we conclude that the Petitioner is not entitled to relief.

## **CONCLUSION**

The judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE